BOTSFORD-CONSTANTINE & TYLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9759, 11616. Promulgated February 7, 1928.

*Alfred P. Dobson, Esq.*, and *R. T. Jacobs, Esq.*, for the petitioner.
*George G. Witter, Esq.*, for the respondent.

OPINION.

ARUNDELL: Although for the year 1919 there are two corporations here involved, the one having its offices at Seattle, Wash., was virtually only a branch of the one at Portland, Oreg., and the Commissioner, in determining the deficiency for 1919, has consolidated them. In 1921 there was only the Oregon company, whose capital had been increased, and which had absorbed the other. For convenience in discussion we shall consider the corporations as one and speak of them collectively as the petitioner.

The tests that a corporation claiming personal service classification must meet are set out in the well considered case of *Fuller & Smith* v. *Routzahn*, 23 Fed. (2d) 959, as follows: (1) It must be engaged in rendering personal service as distinguished from trading, merchandising or manufacturing; (2) its income must be primarily due to the activities of the principal stockholders; (3) the principal stockholders or owners must themselves be regularly engaged in the active conduct of the affairs of the corporation; and (4) capital whether invested or borrowed may not be a material income-producing factor.

We have found as a fact in this case that the three men who held all the stock in 1919 and the two who owned it all in 1921, except

qualifying shares, were regularly engaged in the active conduct of petitioner's affairs; likewise, it is clear that petitioner's income was not derived from "trading, merchandising or manufacturing." These elements may therefore be eliminated in petitioner's favor from further consideration.

We find much more troublesome the second test enumerated above, viz: Is the income of petitioner to "be ascribed primarily to the activities of the principal owners or stockholders"? It is clearly in evidence that the business of petitioner which resulted in income had its inception in contacts made by some one of the principal stockholders; that the stockholders secured all contracts for the placing of advertising and that after the business had been secured, the activities of the stockholders did not cease, but were continued through contact with the advertisers. The employees of petitioner never solicited or obtained any accounts. The list of employees set out in the findings of fact is misleading in that the employees there listed were not all in petitioner's employ at one time. The list includes those who were employed at any time, some of them being engaged during only part of the taxable years. This is the testimony of one of the principal stockholders and it is corroborated by the salary figures. Nor can a proper conception of the duties of the employees be had from the titles set out. They had no creative duties; they came into petitioner's scheme of operation only after an income-producing account had been obtained and the income-producing idea conceived by one of the principal stockholders; their duties were purely routine and they were employed by petitioner only because the principal stockholders did not have the time to devote to office details and routine matters. The large amount of advertising which petitioner placed during the taxable years resulted from the recognized ability of the stockholders to handle advertising satisfactorily and not because of the number of employees it had. While the employees perhaps were the means of petitioner placing more advertising than would be possible were the stockholders required to handle all office details, this does not destroy the fact that the business was secured by the stockholders and the income was primarily due to their activities. It was to them that advertisers looked for service and it was for their services that the advertisers paid. The petitioner could not function without the stockholders, whereas the employees were not an indispensable factor. We do not attempt to say that petitioner's income was due solely to the activities of the stockholders. It is not necessary to go to that extent as all that the law requires is that it be primarily attributable to their activities. *Bryant & Stratton Commercial School, Inc.*, 1 B. T. A. 32, 37. In the case of *Patterson-Andress Co.*, 6 B. T. A. 392, personal service classification was denied partly on the ground that there was no evidence as to the character

of the services performed by a large group of nonstockholder employees. Such is not the case here, for the evidence fully described their duties and is convincing that no material part of petitioner's income may be ascribed to their activities. The opinion in *Fuller & Smith* v. *Routzahn, supra,* is singularly apt on this phase of the case. We quote from it as a proper conclusion in this case:

On the whole, it must be found that the employees to whom these salaries were paid were clerks and assistants, such as are found in every law office and whose work bore no material relation to the needs of the business either as a business getter or as a directing head.

Finally, there is a question of whether capital was a material income-producing factor. We have found as a fact that, except for a small part of the advertising placed, petitioner was paid by the advertiser for space used before payment was due the publisher. In all of those cases petitioner had no need for, and did not use its capital. We gather from the record, although not clearly shown, that petitioner was not primarily liable to publishers for the value of the space. Regardless of its legal liability, the fact is that in the majority of its accounts petitioner was not called on to use its capital. The actual method of operation and not the theoretical or legal liability is what controls. *S. A. Conover Co.,* 6 B. T. A. 679; *F. Wallis Armstrong Co.* v. *McCaughn,* 21 Fed. (2d) 636. The only cash capital paid in was $3,000. For the balance of the capital stock issued, the three principal stockholders paid in furniture and fixtures and the good will of advertisers that they had built up through their personal handling of advertising. The stockholders had very few actual contracts with advertisers and such as they did have were subject to cancellation on short notice. For the most part the so-called good will shown in the balance sheet consisted merely of an understanding between the advertiser and the stockholder that the latter would handle the advertising matter of his client.

The borrowings of petitioner from its bank are set forth in detail to show the small amount as compared to the volume of business transacted. The maximum borrowed at any time was $8,000 and the average amount of the borrowings was only $2,326.21. It is evident that no material part of income could have been derived from these short-time loans.

For the year 1919 the excess of petitioner's accounts receivable and trade acceptances over the accounts payable for space averaged $18,939.90. Deducting from this the 15 per cent commission leaves an excess of $11,856.27. The advertising space for that year amounted to about $442,000 and the gross income was $66,141.19. For 1921 the average of receivable and trade acceptances exceeded the average of space accounts payable by $26,575.06. Commissions deducted from

the receivables leave an average excess of $18,182.56. For that year petitioner placed advertising in the amount of $528,267.69 and had a gross income of $75,999.71. From these figures it is clear that even if all the excess of receivables over payables be considered as capital it was not sufficient to play any material part in the production of the gross income, which we have held in *Denver Live Stock Commission Co.* v. *Commissioner*, 7 B. T. A. 985, is the income referred to in the statute. In the case of *S. A. Conover, supra*, where personal service was allowed, the evidence indicated the use of from $10,000 to $20,000 in a business which placed $200,000 in advertising. The average capital in this case compared to gross income and advertising placed is less than that in the *Conover* case, and capital was not, in our opinion, a material income-producing factor.

Reviewed by the Board.

*Judgment will be entered for the petitioner.*